Good morning everyone. The first case this morning is number 075142, Stopped in East Water against the United States, Ms. Spalletta. Thank you. Good morning, your honors. Today we will talk about a case involving New Melones Reservoir, a unit of the Central Valley Project in California. Early on, the United States needed the cooperation of the two plaintiffs in this case, Stopped in East Water District and Central San Joaquin Water Conservation District, in order to complete its project. It needed the promise of these two districts that they would utilize the water beneficially on their lands and would construct a $65 million dollar conveyance facility to move that water from the federal dam to their lands. The United States used those promises to go back to the state of California and obtain the required approvals to fill New Melones Reservoir. What else did they obtain from the state besides the approvals to fill? Did they get the rights to the water? They get the rights to the water in name. The permit is held in name by the United States. However, under both California law and the law of the United States through the U.S. Supreme Court and Section 8 of the Reclamation Law, the United States holds those water rights in trust for the landowners who put the water to beneficial use. What Supreme Court case are you referring to? Ickes v. Fox. What does that say? The specific language is, although the government diverted, stored, and distributed the water, the contention of petitioner that the ownership of the water or water rights became vested in the United States is not well founded. Appropriation was made not for the use of the government, but under the Reclamation Act for the use of the landowners. By the terms of the law and the contract already referred to, the water rights became the property of the landowners, wholly distinct from the property right of the government in the irrigation works. Under which state law? Is that California law? California law also has a law that says that the right to use the water... Excuse me, was Ickes under California law or was that in a bottle? Ickes was decided under Section 8 of the Reclamation Law. But which state? To be honest with you, I don't remember the state. Well, it's not California law. No, there's not a US Supreme Court case dealing with California law other than the United States versus California that dealt with this specific reservoir, but that issue was not addressed in that case. But if in fact the water rights are held by the DOR or the US, what rights do the users have except the right to use, not the ownership rights to the water? The legal right to the water still is in DOR, is it not? In name, the legal right is in the Bureau of Reclamation. However, water rights are a substitutory. They're in the name. The permit is in the name of the United States. The use of fracturee right is in the landowners who put the water to beneficial use. That was actually confirmed by the California State Water Resources Control Board in its own administrative orders, which state that the United States holds all water rights acquired for project purposes in trust for the project beneficiaries, who by use of the water on the land will become the true owners of the perpetual right to continue such use subject only to continual beneficial use and observance of any and all contractual commitments to the United States. But the legal right still remains with DOR? In name, yes. The legal right still remains in DOR. In name or otherwise, the legal right is in DOR. I'm afraid I cannot agree with you. Under California Appellate Court precedent, the legal use of the water is deemed to be the landowners who put the water to use under contract with the United States. That was in the recently decided Fifth District Court of Appeal case. That's in the consumptive use. Correct. But not the legal right to the water. The legal right to the water, legal right to divert the water remains in the US. The diversion right remains in the United States. Ms. White, I don't want to ask you to go outside of the record, but was there any particular event which triggered this change in relationship and the change in the provision of the water to the landowner? That's an interesting question because as far as timing goes, the United States and the plaintiffs enter into their contract in 1983. It took from 1983 until 1993 for the United States to complete the permitting approvals from the state and for the plaintiffs to construct a very large conveyance facility to get the water to their lands. Just when both of those events had been completed is when the plaintiffs started asking for water. At that point in time, for the first few years of their request, they received nothing. And then there were some deliveries, and then for the later end of the time period at issue in this case, the deliveries were ratcheted down significantly. So 1993 to 2004, the regulatory environment was actually the same during that time period, and it was the only time period where the plaintiffs could take water. You referred to the request by the contractor for water, and the reclamation people didn't provide it. I'm puzzled as to why the contractors never actually complied with the requirement that the contract has for them to submit a schedule indicating the amounts of agricultural and M&I water required monthly. Section 4 of the contract specifically requires that they provide that information to reclamation. What happened to all of that? In the early years of 1993-1994, the contractors did submit the schedules directly in accordance with Article 3 and Article 4 of the contract. However, they received no water. This issue was tried at length in the trial court. The evidence that came out was that the Bureau of Reclamation officials wrote back to these contractors and said, please don't send us a schedule in the fall. We will come out with an allocation in January, February, and March, and we will tell you what we are going to get. That explains the trial judge's conclusion, I suppose, that there was no breach on the part of the contractors for failure. It's not that clear from the opinion as to exactly that there had been that exchange, but that explains why there was no breach by the contractors. Okay. What happened with respect to the amendment that was adopted by the Congress in 1992?  Yes, the Central Valley Project Improvement Act came into play concurrently with the completion of the plaintiff's facility, so it was in place the entire time that the plaintiffs were requesting water and for the time period that's in dispute in this appeal. The United States did use water from New Melones Reservoir to satisfy the 800,000-acre fleet requirement of Central Valley Project Act 3406B2. What impact did that have in the delivery? It's unclear what impact that had in delivery because we never received any form of factual determination from the contracting officer for the years in dispute stating whether or not the deliveries under the Central Valley Project Improvement Act prevented performance by the United States. As far as these plaintiffs knew, these deliveries were not made or were made in minimal amounts. The United States was making releases from the reservoir for CVBIA purposes. However, there still remained a tremendous amount of water in storage. For the bulk of the time period in dispute in this appeal, there was so much water in storage, in fact, that the reservoir was overflowing. Judge Ghiarsa has asked a critical question that I think we really need to focus in on, which is, assuming that reclamation has responsibility to the fish and wildlife requirements, to the salinity requirements, to comply with the state requirements for its permit, and to comply with the requirements under the Improvement Act, assuming reclamation met all those requirements before there were any diversions for the contractors, was there still water in the reservoir sufficient to meet the requirements of the contractors? What do we know about that? I can't find anything. I've read the trial judge's extensive opinion all the way through, and I'm still a little puzzled as to exactly what the findings on that particular issue are. Can you help us with that? And I'm going to ask the government to also contribute to that discussion. I can help you with that. That was actually the subject of extensive testimony at the trial court, although it didn't make its way into the opinion. The parties had stipulated to a chart, which included a variety of information about the facts relating to operation of the reservoir. And that chart was Joint Exhibit 28. It was found at A4976 in the appellate record. And it looks like this. And I have extra copies. Is it in our appendix? It is in your appendix, A4976. I believe it would be in the second volume. It may be a little hard to read, given that it's reduced in size. However, in that document, we stipulated to the level of storage in New Maloney's every year. 976, you say? 4976. Ah, yes. All right. The second-to-last column in the chart is the end-of-year storage amount in New Maloney's every year. As you can see from this chart, although in the early years, storage levels were lower, because of several wet and above-normal years, the storage levels recovered and stayed well over a million acre-feet for the duration of the time period in dispute. What was the amount they needed for power generation, even though, as I gather, power generation was not a priority? Nevertheless, what was their power generation requirement, minimum storage requirement? Do you know? 300,000 acre-feet is the minimum power pool for New Maloney's reservoir, and the United States actually used that as the reason for non-delivery in 1994, when storage levels were low. Well, what this table says is that, if I read it correctly and if I understand your argument, you're saying there was more than enough water for Reclamation to provide, what was it, 155,000 acre-feet total for the contractors? Correct. And what is particularly troublesome— And then what is the explanation for why they weren't providing that water? We have never received an explanation for why the United States would not release water from storage to satisfy these contractors, particularly in the early years when they were given zero. It was particularly troublesome because a release of a mere 10 or 20,000 acre-feet of water would have literally been less than the evaporation off of the reservoir in that year. It was a de minimis amount. Well, with all due respect, there must have been some reason why they weren't doing it. I assume the government wasn't just arbitrarily saying, we made a contract with you and we're not going to uphold it. There had to be some explanation. That is one of the key problems in this case. The explanation that the contractors received came in the form of cursory press releases stating the amount of water that the contractors for the entire Central Valley Project would receive. The testimony at trial illustrated that the contractors had representatives who were constantly on a letter-writing campaign and requesting meetings with reclamation officials to learn more about how the reservoir was operated and to question the operations. And for the most part, those letters got nowhere. Should we hear from the other side or do you want to pursue this? No, that's fine. Okay, we'll save you for rebuttal time. We want to be sure we hear all of his issues. Thank you. Okay, Ms. Kovacs. Good morning. May it please the Court. Katie Kovacs for the United States. This is an intensely factual appeal. The districts have not met their burden on appeal of showing that the trial court's factual determinations were clearly erroneous. Now, focusing first, I'd like to get to Judge Garris' question about the taking claim, but I think this appeal really turns on the breach of contract claim, and I'd like to get right to your question, which I think is the heart of the case. Let's get to the contract case first. Yeah, I'll make a point of answering your question. Article 9, this case turns on Article 9 of these contracts. What Article 9 does, in essence, is allocate the risk of shortage to the irrigation districts. So long as the Bureau of Reclamation employs all reasonable means to avoid a shortage, and the contracting officer determines that the shortage is beyond the government's control, Article 9 provides, quote, no liability shall accrue. Their primary argument is they concede that most of what was going on at New Melones, most of the reasons that the water was released from New Melones, they concede that that takes priority over their contracts. They concede that the Bureau of Reclamation had to satisfy senior water rights. There's no issue on any of that, so there's no question of impossibility, I could say, and there's no question of that related doctrine, sovereign immunity. All that stuff is really irrelevant because they concede that all of that takes priority. Exactly. The only real question, it seems to me, is was there water in the reservoir that could have met their needs? Exactly. And if there was, why didn't the government choose to make it available? Exactly. In other words, the way they put it, they allege that the Bureau of Reclamation operated the project too conservatively. So you release water in the summertime for the irrigators, and at the end of the season there's water. Let's answer the question directly because everything that we've seen so far suggests that except for two years, there was adequate water. Exactly. And the entire basis for this argument, that there was water left at the end of the season, there was water in the reservoir over the winter that you could have released, that argument, the trial court found, was based entirely on their expert's testimony. Now, their expert- But you haven't disputed the actual numbers as to what water was remaining, as I read it. What we've disputed- Do you agree this table is correct? Oh, yeah, the table is absolutely correct. I know what the table shows. So there was more than enough water in the reservoir? Except it wasn't. What the trial court found, as a matter of fact, is that it wasn't reasonable, it wouldn't have been reasonable for the Bureau to release that water at the end of the season. Because if you have water in the reservoir and you release it all, you go through the winter and it doesn't rain as much as you hoped. Come springtime, the Bureau of Reclamation might find itself in violation of state law. So what they do, this is a primary practice- Yes, so 1682 of the appendix, in particular- I don't recall findings by the trial judge. There are findings. Her opinion is so long and it's such a factually intense case. Again, they're the plaintiff and they bear the burden of proof, and the entire basis for this argument that it was physically possible for the Bureau of Reclamation to release the water was based on their expert testimony, but- Well, no, that was their argument. That was their argument. And it's really reasonable, whether it was- We can ignore the argument about it being physically possible. The question is, what is the test that the government was to be held to? And I'm puzzled a little bit. Is the question whether the government reasonably operated the Maloney's Dam? Is that your view? That's what it boils down to, but it's not quite that simple. The first sentence of Article 9 requires the Bureau of Reclamation to employ all reasonable means to avoid a shortage. And then the second sentence- In doing what? In operating the project. The Bureau has to employ all reasonable means- Project meaning? The new Maloney's Dam. No. That's not the project. I'm sorry, I misspoke. I meant new Maloney's Dam. I think that the contract speaks to the Maloney's Dam. That's not the project. Not to the project. Oh, no, I'm sorry, you're right. It says in its operation of the project. So it's operation of the project as a whole. As a whole. Yes, it does say in its operation of the project. Because project is defined as the- The entire CBP. The entire CBP. Correct. All right, now- So that's the contract standard. Well, the contract standard is in its operation of the project, the United States will use all reasonable means- Correct. To guard against a condition of shortage. Let me try this thought on you. I'm a little puzzled between what the trial judge seemed to focus on, which was the question of whether the government acted reasonably under the circumstances. Taking into account that if they drew down prematurely, then the next year they might be in shortage and what have you. And the question of whether that actually meets the standard of the contract. Let me try this argument, this thought hypothetical. You and I go hiking in the woods on a late fall day. And I wear a jacket, but you choose not to. And it turns cold. And you say to me, hey, I'm cold. Can I have your jacket? And I look at you and I say, well, no, frankly, because if I give you my jacket, then I'll be cold. And that seems unreasonable. Now, someone looking at this from the outside might say, Plager acted reasonably in not giving his jacket because he would have been cold and you chose not to take one. But before we go for a hike, I say to you, don't worry about it. I promise you that I will see to it that I'll take all reasonable means to make sure you are not cold. Then we go on the hike and you say I'm cold. And then I refuse to give you my jacket. That may very well be a different case, right? I may have acted unreasonably because I'm now under a duty to take all reasonable means, which may include giving you my jacket or my socks or whatever else to keep you from being cold. Now, it seems to me that when I read Article 9A, it's not a question of whether the government acted reasonably in the operation of the overall project or particularly of the Maloney's Dam. But whether the government took those actions necessary to use all reasonable means to guard against the condition of shortage. I don't find the evidence in the record on that issue. Can you help me? They're the plaintiff. They bear the burden of putting on the evidence. Oh, not on that issue. Yes, on that issue, Your Honor.  Not on that issue. Come, come. The contract puts the burden on the United States. The contract chose to say the United States will use all reasonable means. Who is in possession of that information? It's an affirmative obligation. On the part of the government. They're alleging that the Bureau of Reclamation violated it. They, as the plaintiff, bear the burden of proof. And Article 9 provides no liability shall accrue. There's simply no breach of contract if Article 9. Who has to put the evidence in on the government's behavior to meet the standard of all reasonable means? Are you saying they have to prove the government used all reasonable means? They have to prove that the government didn't use all reasonable means. Really? They're the plaintiff. They are alleging that we violated. Even though the government is uniquely in possession of the only evidence on that court? I think where your question is going, Your Honor, is to what Ms. Spoleto was talking about, about the Bureau of Reclamation not providing the information. The trial court found, as a matter of fact, and there is a long string site in the red brief at pages 49 and 50, that shows all of the places in the record where this information was provided to the districts. Now, it's notable that unlike some other provisions in the contract, Articles 2B and 3A, Article 9A does not require any written notice at all. And that is a direct contradiction. That's not the question. The question is, what evidence did the government put in, and can you please cite it? As near as I can tell, the government didn't put on much in the way of witnesses. Did they put in any witnesses on the question of their using all reasonable means to guard against a condition of shortage? Could you cite me to where that is? Again, the trial court held early on in this case and repeatedly that they bore the burden of proof as the plaintiff. In the case, they argued that the Bureau of Reclamation violated Article 9A. In support of that allegation, of that claim, that the Bureau of Reclamation didn't use all reasonable means, they relied almost entirely on an expert who did a post hoc mathematical manipulation using a computer model. But he himself admitted that he was not opining about whether the operational decisions had been reasonable or not. He wasn't making any statement about whether the Bureau of Reclamation had employed all reasonable means. He was simply saying that it was physically possible. I agree with that. All he did was verify the tables. Right. And then if you get to the particular, they proffered a few particular- What I want to know is where is the evidence of what the government did to take all reasonable means to guard against a condition of shortage? For example. Where is that evidence? For example, they alleged that the government should have purchased water. In fact, the government does purchase water. That's one of the reasonable means that the Bureau of Reclamation employs. And so there is evidence in the record that they purchased water in order to prevent a condition of shortage at Maloney's. Exactly. To be able to satisfy the CBPIA and still be able to deliver water under these contracts. That evidence is in the record? That's in the record. It's in the red brief. Another thing they alleged the Bureau could have done is used water from other parts- No, let's go back one step. You're saying that there was compliance with the contractual amount for these periods in which water was purchased in order to comply? Well, the Bureau of Reclamation did deliver some water to the districts. They are alleging that the Bureau didn't deliver enough water. That's true. In terms of their obligation. Well, the Bureau didn't deliver as much water as the districts wanted. So another example- No, it's the Bureau's contract is to deliver. And this is where I disagree with your honor. I think that Article 9 has to be read in conjunction with the rest of the contract. And under Article 9- You're saying the numbers in the contract don't count? We should reevaluate their needs? Well, under Articles 3 and 4, there are minimum and maximum amounts established. And I have to tell you, this is a very unusual contract. From what I understand, there are no other contracts that look like this in reclamation law. It's very unique, and it's a unique reservoir. It has a unique position geographically in the project. And that's in the record. Is there something in support of why the government is relieved of its contractual obligation? Because it's unique? No, I'm trying to put my answer to your question in perspective, your honor. Articles 3 and 4 establish minimum and maximum delivery amounts of water. But Article 9 allocates the risk of shortage. It acknowledges that even if everybody does everything they can, shortages may occur. And the districts agreed in these contracts to take on the risk of shortage. Just to be sure that I understand your argument. Your argument is that it allocates the risk of a possible shortage, which never occurs. Oh, no, there was definitely shortage in this case. Shortage of what? Of water. Of water. In where? In New Malonestown. There was a record drought in these years. How does that conform to column New Maloney storage numbers that you just gave us in A4976? What is the shortage in the dam? This gets back to their allegation that there was water in storage over the winter. You should have released it the year before. But that's, again, based on their expert saying, and the bare number here doesn't account for the fact that if you release all that water in the fall of 94. You're making the same circular argument, Ms. Kovacs, because that argument does not address the question of the evidentiary base on which the government is saying, we met our burden of carrying out, you say, 9A is their defense. We met our burden of using all reasonable means to guard against the condition of shortage. The trial judge understood this problem. If you look on page A64, actually page 62 of the trial judge's opinion, what the trial judge said was, quoting from her own summary judgment opinion, she says, defendant, I believe that's you, in theory, admits liability in those situations where plaintiffs submitted valid schedules for water. Well, we've waived that requirement. We've all agreed on it. And reclamation did not provide it. So you have admitted liability as long as reclamation's performance was not excused by one of the other provisions of the contract, most notably, but not limited to, Article 9A. So she is saying, if I understand it correctly, you have an affirmative defense. Your affirmative defense is Article 9A. Look, we did all reasonable things. We used all reasonable means to guard against the condition of shortage. And the question is, where is the evidence that you did all of those things? Again, I think that she actually held that they continued to bear the burden of proof. But even if you read the contract that way, that it's an affirmative defense and we bore the burden of proof, again, the record shows that it was not possible to use water from other parts of the project to satisfy the CVPIA, that New Malonis is in a unique hydrologic position. Refer the court, in particular, to pages 1715 to 1717 of the transcript, where Lowell Ploss— Say that again? 1715 to 1717, where Lowell Ploss testified, explained that New Malonis Dam is the only CVP reservoir that has a physical connection to the Stanislaus River. And that's why it is the preferred release point for meeting these state fishery and salinity and dissolved oxygen and all these senior obligations. The obligations that they concede are senior to their contract rights. But isn't the argument that Judge Plager first posited that this is an entire project? You're not running one piece in one manner and another piece in another manner. BOR really needs to take into account, in the management of the water project, the entire project, not just one piece of it. Exactly. And one of the other points— Excuse me, is that within their discretionary authority under the contract to do that? To do? To run it as a total package, as part of the total Central Valley project? Oh, sure. I mean, that's pretty well understood. Sure. As part of the Central Valley project. And one of the keys about this reservoir, which is also in the record, is that New Malonis is an unusual reservoir in that it has very low rates of inflow compared to the size of the reservoir. So after this record five-year drought, the rest of the project recovered, I guess, fairly quickly. The record shows that New Malonis did not recover nearly as quickly as the rest of the project. That's at pages 3410, 3413. Which years is this reflected? I'm sorry? Looking at this table again that we've been talking about, which years are you talking about? 1995, in particular, is the year that Ms. Spalletta referred to. In 1994, she said the Bureau of Reclamation gave power priority. The record actually shows to the contrary, at pages 3384 and 3962, that in 1994 the Bureau of Reclamation determined that that was a critically dry year and water deliveries had to be shorted simply because there wasn't enough water available. The following year, coming off of this five-year drought, the Bureau of Reclamation was a little conservative. They're worried that come springtime they're not going to be able to meet the permit requirements. There's no question they acted reasonably. They acted reasonably. No question about it. At pages 3410 and 3413, it shows that in 1995, New Melones had not recovered after this drought to the same extent as the rest of the project. Then coming into a bunch of years they have conceded for various reasons are not at issue. The other period that is at issue is 1999 to 2004. The record shows that in those years, again 1682, that the Bureau of Reclamation retained that water in storage over the winter in order to satisfy all of these obligations that they concede are senior to their contract right. Even their director conceded that this is a matter of judgment. It's certainly not unreasonable for the Bureau to operate the project this way. That's the issue in the case, though. That's what I've been trying, obviously, unsuccessfully to get you to address. Okay. If I might touch- I think we're out of time. Is there something critical you'd like to add? If I might just touch on Judge Gallar's first question in the case very briefly on the taking claim. For the first time in their reply brief in this court, that is the first time the plaintiffs made any effort to show that the trial court's sua sponte dismissal of the taking claim was wrong. It's too little too late. But their allegations about California law are absolutely wrong. Ickes v. Clark was not a California case. I believe that you're right. It was a Nevada case. Nevada case. It has no-  Did the trial judge say at the outset that the takings issue was not before her in this argument? She didn't. She didn't? No. The record, what she did was bifurcated liability and damages. But everybody went into the trial with the understanding that the trial was about the breach of contract claim. That's not reflected in the record, but that is clearly what everybody understood, that the taking claim was not on the table. She sua sponte dismissed the taking claim after the trial following this court's precedence, including Hughes Communication and so on, where this court has said that trial courts should be careful not to commingle breach of contract and taking claims. They were not entitled to be heard on that question. Well, they filed a 59E motion to alter or amend when she did the sua sponte dismissal. But all they said in that was, please vacate the dismissal and have a conference so we can decide whether we want to pursue this. They never made an attempt. They didn't even try to show that she was wrong for dismissing until their reply brief in the Court of Appeals. It's too little, too late. And as a matter of California law- That's the only occurrence that I could find. So to answer the question, refer the court to Joint Exhibit 23, pages 127 to 129, have a discussion of that issue. Thank you. Thank you, Your Honor, very much. Ms. Belletti. Thank you, Your Honor. First of all, we did raise the issue of the due process on the takings claim in the opening brief of the appellant, and you'll find it there. We did not raise it in the trial court, one, because we did not have to, and two, because our motions to the trial judge were designed to get the record as clear as possible on the breach of contract claim for the purposes of an appeal. I'd like to briefly talk about Article 9A. There is nothing in Article 9A that says the United States is excused from liability if it operates New Maloney's or the greater CVP reasonably. The express language says, in the operation of the project, the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the contractor pursuant to this contract. It's an affirmative obligation to guard against shortage to these specific plaintiffs. It's an obligation that even the trial court acknowledged the United States did not have to accept, but voluntarily did. Secondly, the second language of Article 9A is a classic affirmative defense. It requires that the contracting officer, defined as the secretary of the interior or his designated agent, must opine that there is a shortage due to causes beyond the control. There is not a single letter from the secretary of the interior opining that there is a shortage due to causes beyond the control of the United States. Why didn't you call witnesses from the Bureau of Reclamation to have them testify on this issue if you thought that the case was not going on the right issue? We did call witnesses that established a prima facie case that there were other reasonable means available to the United States that would have allowed them to deliver more water, including calling as an adverse witness the prior operations manager of the project, Lowell Ploss. Through Mr. Ploss, we established that the United States could have released more water from storage. There was no law or regulation that prevented them from doing so. We established that there could have been less CVPIA water use from New Melones in two ways. One, during a drought, the secretary of the interior could have utilized the 600,000-acre-foot option available under the statute to reduce the burden on the CVP. He never chose to do so. Well, he could have, but does that mean that it's in compliance with the overall plan, the overall proper management plan of the Central Valley Project? I mean, he could have done a lot of things. He could have seeded the clouds, too, and made more rain. I don't think that would have been a reasonable means, but certainly utilizing a statutory exception that would allow more water to be delivered to these contractors was a reasonable means, and he did not employ it. But still within the prerogatives of his discretion in planning the entire project requirements so that the allocation could be made properly under the plan. Precisely within his discretion, which means he could have used it as part of the reasonable means to satisfy the all reasonable means requirement of Article 9A. Granted, once we established the prima facie case that there were reasonable means available, we expected that in the case of the government they would put on their witnesses, particularly someone who would say, I was the contracting officer, I declared a shortage, and these were my reasons for doing so, but we never heard that. In fact, the only person in that courtroom who ever said that these news releases satisfied Article 9A was the attorney for the government. Not a single witness for the government stated that they were the contracting officer or identified the contracting officer or stated that the contracting officer ever issued a shortage determination under these contracts. So once the plaintiff had established that prima facie case, the burden switched to the government to explain why, with water in the reservoir, it still did not deliver. Once the government had put that evidence on, if they had, the standard would have been, was the government's decision arbitrary, capricious, or unreasonable? But absent that evidence, there was no way that a trier of fact could conclude that the decision of the government to declare a shortage was reasonable. I'd like to talk about the particular years in dispute. In particular, 1994, the site in the record is A3963. That is the news release put out by the Bureau of Reclamation that states specifically that no water will be delivered to the plaintiffs in order to maintain a minimum power pool to generate electricity of 300,000 acre feet. As we pointed out in our papers, this is expressly contradicting the CVPIA's priorities, which require that irrigation have a priority over power. To the extent that that news release can be determined a shortage declaration, it is arbitrary and capricious because it directly conflicts with federal law. In 1995, it was one of the wettest years in the history of the project. Contrary to what counsel for the government said today, New Melones Reservoir fully recovered in storage and was spilling by the end of the year. Is that part of the record? Yes, it is. All right, then I don't think you have to testify to it. The citation is A3570, and it's a chart that was prepared by the plaintiff's expert showing the full recovery of storage. Again, in that year, the government held back and capped the plaintiff's allocation at 37,000 acre feet, even though the reservoir completely filled. In 1999 through 2004, there was ample water in the reservoir. The only testimony that the trial court relied on to conclude that there had been a shortage determination was the testimony of the ex-regional director, Roger Patterson, who actually left the employment of the United States in 1999 and was not even present in the Bureau of Reclamation for five of the years in dispute. He was specifically asked why the allocations were what they were for the years in which he was in office, and his answer to each question was, I don't know. Whose witness was he? He was a witness for the government. He also did not identify himself as the contracting officer. Okay, you have another minute. If the court doesn't have any further questions, I would like to just point out the burden of proof in this case. The trial court seemed to think that the plaintiff had the burden to prove that the United States operated unreasonably. We've put in our papers a lot of cases that explain that once the plaintiff has proven that the other party to the contract did not perform and put forth evidence showing performance could be done, the burden shifts to the non-performing party to prove an excuse for non-performance. The Genio case and many of the other cases we cited are exactly on point. In Genio, the court said that the non-performing party should not have the burden to disprove an excuse for non-performance. The trial court's decision in this case expressly contradicted the holding of Genio. Okay, thank you. Again, we're out of time. Ms. Kovacs, thank you both. Questions taken under submission? Well, thank you.